[Cite as *State v. Slagle*, 2012-Ohio-1575.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | Appellate Case No. 23934 |
| Plaintiff-Appellee | : | |
| | : | Trial Court Case No. 04-CR-526 |
| v. | : | |
| | : | |
| JOHN W. SLAGLE | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 6th day of April, 2012.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by KIRSTEN A. BRANDT, Atty. Reg. #0070162, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, P.O. Box 972, 301 West Third Street, Dayton, Ohio 45422
        Attorney for Plaintiff-Appellee

R. JASON HOWARD, Atty. Reg. #0074662, 4130 Linden Avenue, Suite 304, Dayton, Ohio 45432-3015
        Attorney for Defendant-Appellant

. . . . . . . . . . . . .

FAIN, J.

{¶ 1} Defendant-appellant John W. Slagle appeals from his conviction and sentence for

Theft of an amount equaling at least $100,000, but less than $500,000, in violation of R.C.

2913.02(A)(2) and 2913.02(A)(3).[1]  He contends that: (1) the trial court committed error when the successor to the deceased judge who had presided over his bench trial rendered a verdict based on her review of the audiovisual record of the original trial; (2) his conviction is not supported by sufficient evidence, because he owned the legal fees he was alleged to have stolen from his law firm; (3) his four-year sentence is disproportionate to his offense; and (4) the restitution ordered by the trial court is against the manifest weight of the evidence, and also exceeds the dollar amount corresponding to the degree of Theft of which he was convicted.

{¶ 2} We agree with Slagle that the procedure followed by the trial court – a successor judge rendering a verdict based on review of an audiovisual record of a bench trial presided over by her deceased predecessor – is not proper under Ohio law.  But the doctrine of collateral estoppel precludes relitigation of that issue.  That procedure was ordered in a federal habeas corpus action brought by Slagle in which the State was a real party in interest.

{¶ 3} We conclude that by virtue of Slagle's contract of employment with his law firm, he did not own the legal fees he stole from the firm.

{¶ 4} We conclude that the four-year sentence is not disproportionate to the offense, which was the Theft of over $500,000 from a law firm in which Slagle was a partner.

{¶ 5} We conclude that the restitution ordered, $521,000, is not against the manifest weight of the evidence, but we agree with Slagle that it was plain error to order restitution in excess of the maximum dollar amount – $500,000 – corresponding to the degree of Theft with which Slagle was charged, and of which he was convicted.

---

[1]The dollar amounts set forth in R.C. 2913.02(B)(2) have been increased, to $150,000 and $750,000, respectively, by statutory amendment subsequently to Slagle's commission of this offense.

{¶ 6}  The order of restitution is Reversed.   The judgment of the trial court is Affirmed in all other respects.   This cause is Remanded to the trial court for the limited purpose of reducing the order of restitution to $500,000.

### I.  Slagle Steals $780,000 from the Law Firm in Which
### He Is a Shareholder and of Which He is an Employee.

{¶ 7}  Pickrel, Schaeffer, and Ebeling (PS&E) is a law firm operated as a professional corporation, located in Dayton.   It is managed by officers selected by its shareholders.

{¶ 8}  In 1986, Slagle was hired by PS&E as a litigator.   In the early 1990's, he became a shareholder.   All attorneys at PS&E, including shareholders, enter into written employment contracts that regulate their conduct.   Slagle executed written employment contracts for the years he worked at PS&E.

{¶ 9}  Slagle's contracts of employment with PS&E included the following provisions: (1) all attorneys were to devote full time and best efforts in the practice of law exclusively for the firm; (2) all fees received from the practice of law were to be turned over to the firm; (3) all clients were clients of the firm, not of the individual attorney; (4) all attorneys were to keep a daily record of their work for the firm, both billable and non-billable, in the form and manner designated by the firm; and (5) all client fees belonged to the firm.

{¶ 10}  PS&E's non-shareholder attorneys received salaries for their services.   Its shareholder attorneys received percentages of the firm's net profits, determined by a compensation committee and subject to shareholder approval, based on the shareholder's contribution to

management, billing responsibility, gross fees, and hours worked. Shareholders were paid during the year with draws against the year-end net profits.

{¶ 11} Customarily, an attorney receiving a settlement check would deposit that check into the firm's trust account. After payments out of the trust account for expenses, to clients, and to other parties entitled to payment, a separate check would be paid out of the trust account to the firm for attorney fees. PS&E's attorneys were not permitted to individually endorse a check, or to receive a check from a client to the attorney, individually, as payment of an attorney fee.

{¶ 12} Between February 1, 1999, and July 13, 2001, Slagle received attorney fees for work he performed while employed at PS&E, but pocketed the moneys himself rather than depositing them into the firm trust account as required by his contract with PS&E.

{¶ 13} Slagle concealed his theft by falsifying PS&E's billing memoranda. The results of his falsifications were that anyone reviewing the billing memoranda would see relatively small amounts of unbilled time in cases that appeared to be unresolved. But in reality, these cases had been settled, sometimes years earlier, and Slagle had received attorney fees far in excess of the unbilled time listed in the memoranda.

{¶ 14} In one case, in which Slagle worked as co-counsel with another local attorney not affiliated with PS&E, Slagle received $100,000 as his share of the attorney fees from the other attorney's trust account, but in multiple checks instead of one check. Slagle deposited some of these checks into his own personal account, and others he caused to be deposited into PS&E's trust account, altering each check in the process. In this way, he was able to minimize the number of client files showing unbilled time.

{¶ 15} In another case, Slagle used this same attorney's trust account as a conduit into

which to deposit fees from a case that had been referred to him by yet another non-PS&E lawyer. Again, Slagle deposited some of the multiple checks written out of this trust account into his own personal account, and caused others to be paid into PS&E's trust account, altering them to facilitate doing so. When the attorney who had referred the case to Slagle inquired as to when she might expect to receive her share of the settlement, Slagle lied and told her that the case had not yet settled.

{¶ 16} In other cases, Slagle endorsed settlement checks over to clients, and then had the client write a personal check back to him to pay the attorney fees. In one case, Slagle had the client's father write Slagle a check personally for the attorney fees.

{¶ 17} Slagle was able to avoid detection of his thefts until April 2001. When PS&E finally discovered Slagle's thefts and confronted him, he resigned from the firm. Both before and after Slagle's resignation from the firm, PS&E attempted multiple times to obtain the information from Slagle or his attorney that would permit PS&E to compute how much Slagle had stolen from the firm. Slagle either ignored these requests or avoided them by lying. In one case, Slagle responded that although he had received a settlement check, he could not disburse it, because the client was accusing him of malpractice. This was a lie.

{¶ 18} After unsuccessful negotiations between Slagle and PS&E, Slagle did return about $159,000 to the firm. But this was far less than the total of the amounts of fees he had stolen from the firm.

{¶ 19} In August 2004, Slagle was charged by indictment with one count of Theft in an amount in excess of $100,000, but not exceeding $500,000, in violation of R.C. 2913.02(A)(2) (beyond the scope of the express or implied consent of the owner or person authorized to give

consent), and one count of Theft, in the same amount, in violation of R.C. 2913.02(A)(3) (by deception).

## II. Course of Proceedings.

### A. Slagle Waives a Jury Trial, Is Tried to the Bench, and the Judge Dies Before Rendering a Verdict.

{¶ 20} Slagle filed a written waiver of his right to a jury trial. The waiver included the following language: "I hereby voluntarily waive and relinquish my right to a trial by jury and elect to be tried by Judge G. Jack Davis."

{¶ 21} The case was tried to Judge Davis. At the conclusion of the trial, it was agreed that counsel would file post-trial briefs in lieu of closing argument. Slagle filed his post-trial brief on November 13, 2006. The State filed its response on December 1, 2006. On March 4, 2007, without having rendered a verdict, Judge Davis died.

### B. A Mistrial Is Declared; Slagle's Motion to Dismiss on Double Jeopardy Grounds Is Denied; and His Attempts to Obtain Immediate Appellate Relief Fail.

{¶ 22} Sixteen days after Judge Davis's death, the State moved for a mistrial, citing the death of the trial judge as grounds. The same day, another judge of the Montgomery County Common Pleas Court entered an order declaring a mistrial, concluding that as a result of the death of Judge Davis while the case was awaiting his verdict "a manifest necessity exists for this Court to declare a mistrial in order to prevent a failure of justice."

{¶ 23} Subsequently, Slagle moved to dismiss the indictment upon double-jeopardy grounds. In his memorandum in support of that motion, Slagle noted that after the entry declaring a mistrial, "the parties were discussing a procedure whereby Judge Kessler would review the audio/visual record and the written arguments of the parties, and render a verdict without conducting a full blown retrial." Slagle cited a Request for Disqualification filed by Judge Kessler after the declaration of mistrial that included the following comment in Judge Kessler's handwriting:

This case was originally Judge Davis'. It was tried, but no verdict was rendered. After Judge Davis' death, there was discussion between $\pi$ & $\Delta$ whether upon transfer here, both sides would agree to retry the case on the video record. The $\pi$ has decided <u>no</u> [this word is doubly underlined], therefore the case should return to Davis' docket for scheduling.

{¶ 24} In his memorandum in support of his motion to dismiss on double-jeopardy grounds, Slagle argued that because the case could be decided by a successor judge upon the audiovisual record of the trial and the written arguments of the parties, there was no manifest necessity for a declaration of mistrial. Therefore, Slagle could not be re-tried.

{¶ 25} The trial court denied Slagle's motion to dismiss the indictment. Slagle appealed. We dismissed Slagle's appeal for lack of a final appealable order. Slagle appealed our dismissal of his appeal to the Supreme Court of Ohio, which did not accept the appeal for review. *State v. Slagle*, 117 Ohio St.3d 1460, 2008-Ohio-1635, 884 N.E.2d 68.

**C. Slagle Obtains a Conditional Writ of Habeas Corpus
from the Federal District Court.**

{¶ 26} Slagle then filed a habeas corpus action in the United States District Court for the Southern District of Ohio, naming the Montgomery County Common Pleas Court as respondent. That court, in *Slagle v. Court of Common Pleas of Montgomery County, Ohio*, S.D. Ohio 2009, No. 3-:08-cv-146. 2009 WL 2982880, adopted the report and recommendations of a magistrate judge, and granted Slagle a conditional writ of habeas corpus:

> A Conditional Writ of Habeas Corpus is hereby issued to Slagle. Slagle shall be discharged from further responding to the Indictment unless the Common Pleas Court renders a decision on the video record already created not later than 180 days from the date judgment is entered in this matter.

### D. The Trial Court Complies with the Writ of Habeas Corpus; Slagle Is Convicted; and this Appeal Ensues.

{¶ 27} Pursuant to the federal court's conditional writ of habeas corpus, the Montgomery County Common Pleas Court, in the person of the judge who succeeded Judge Davis in office, rendered a verdict convicting Slagle on both counts of Theft contained in the indictment.

{¶ 28} At sentencing, the trial court merged the sentences on both counts into a single four-year sentence. The trial court ordered restitution to PS&E in the amount of $521,000.

{¶ 29} From his conviction and sentence, Slagle appeals.

### III. The Procedure Followed by the Trial Court Violated Neither the Due Process Clause Nor the Double Jeopardy Clause.

### A. In the Opinion of this Court, the Procedure Followed by the

**Trial Court Was Not Proper Under Ohio Law.**

**{¶ 30}** Slagle's First Assignment of Error is as follows:

THE TRIAL COURT'S PROCEDURE IN GRANTING THE PROSECUTION'S MOTION FOR MISTRIAL DENIED THE DEFENDANT A FAIR TRIAL AND DUE PROCESS UNDER THE FIFTH AMENDMENT TO THE U.S. CONSTITUTION. THE COURT SHOULD HAVE CONDUCTED A HEARING, CONDUCTING A CRIMINAL RULE 25(B) ANALYSIS, WHICH NECESSITATES THE APPLICATION OF CIVIL RULE 63. FAILURE TO HOLD SAID HEARING ALSO DENIED THE DEFENDANT THE OPPORTUNITY TO RAISE OTHER OPTIONS TO AVOID A MISTRIAL, THUS CREATING DOUBLE JEOPARDY AND NECESSITATING DISMISSAL OF THE INDICTMENT.

**{¶ 31}** In his argument in support of this assignment of error, Slagle appears to be arguing both: (1) that the trial court could not properly proceed by having Judge Davis's successor view the audiovisual record of the trial and then render a verdict; and (2) that once a mistrial was improperly declared, it became too late to do anything other than discharge Slagle on Double Jeopardy grounds. We decline to address the merits of Slagle's second argument, beyond noting, in Part III-B, below, that it is barred by collateral estoppel.

**{¶ 32}** Slagle's first argument is also barred by collateral estoppel, but because we agree with him, we choose to address it.

**{¶ 33}** Slagle argues that when a judge is the finder of fact, in a bench trial, that judge, and that judge alone, can evaluate the evidence and return a verdict. A successor judge may not

render a verdict, because the successor judge was not present to hear and see the witnesses.

{¶ 34} One case Slagle cites, *Welsh v. Brown Graves Lumber Co.,* 58 Ohio App.2d 49, 389 N.E.2d 514 (9th Dist. 1978), even goes so far as to hold, in a civil case, that the parties may not even stipulate to a procedure whereby a successor judge shall issue findings of fact and conclusions of law on a record made up before the predecessor judge.  We would not go so far.  We cannot distinguish that situation from one in which the parties appear before the successor judge for a new trial, and by stipulation, submit the case to the successor judge on the transcripts of the testimony at the first trial, without presenting any live witnesses.

{¶ 35} Slagle does cite a number of other cases in which it has been held that a successor judge may not render a verdict in a bench trial based upon review of the record made up in the original trial before the predecessor judge.  See, e.g., *State v. Adewusi*, 1st Dist. No. C-070270, 2008-Ohio-2055.  In none of those cases, however, does it appear that the successor judge had an audiovisual record, as opposed to a written transcript, upon which to base a verdict.

{¶ 36} An audiovisual recording may seem, at first thought, to contain the necessary predicates for evaluating testimony that a printed record lacks.  But in our view, an audiovisual record still falls short of being an adequate substitute for having been present, in the courtroom, to see and hear the witnesses.  For one thing, we can testify to the deficiencies of the audiovisual recordings available of proceedings in the Montgomery County Common Pleas Court.  They are routinely available to us on appeal, and we sometimes view them, as a way of supplementing the printed transcript.  Their video quality is not good; these are not high-definition recordings.  Much of what is said is inaudible, or badly distorted.  Even when we can make out what is being said, we have the sense that a great deal of what occurred in the courtroom is lost to us.

{¶ 37} But even if the quality of the audiovisual recordings of proceedings in the Montgomery County Common Pleas Court were vastly improved, they would still not be able to pick up the ambience in the courtroom that is not within the view of the camera or within the effective range of the microphones. As just one example, imagine that a medical witness is testifying in a homicide case concerning the extent of the victim's injuries. The factfinder is aware that the mother of the victim is present in the courtroom. That factfinder will appreciate that the witness may be soft-pedaling the horrific nature of the victim's injuries in consideration of the mother's feelings, and can evaluate the testimony accordingly, but the person viewing the recording later will not be in a position to include that consideration in evaluating the testimony. The reader can doubtless think of countless other examples where the ambience in the courtroom may effect the testimony from the witness stand, or the demeanor of the witness, in a way that only persons who are present in the courtroom can appreciate.

{¶ 38} We realize, of course, that we are expressing an opinion of this issue that conflicts with the opinion of the trial court in Slagle's federal habeas corpus proceeding. In the report and recommendation of the magistrate judge that was adopted by the federal district court, reference is made to the ubiquity of police cruiser videos in search and seizure cases, as reflecting the impact of audiovisual recordings on the extent of the deference normally accorded to the finder of fact by a reviewing court. *Slagle v. Court of Common Pleas of Montgomery County, Ohio,* supra, 2009 WL 2982880, at *7, fn. 6. We point out that a police cruiser video is ordinarily an exhibit that has been admitted in evidence, so that it can be evaluated just as readily by the appellate court on review as by the trial court; both courts are looking at exactly the same thing – they are having the identical evidentiary experience.

**{¶ 39}** Finally, we note that the logic of the federal court's decision is not necessarily limited to bench trials. If reviewing an audiovisual recording of a trial is not distinguishable, for double-jeopardy purposes, from the experience of actually being in attendance at a trial, then there would seem to be few, if any, situations in which there would be a manifest necessity for a mistrial in a courtroom equipped with audiovisual recording equipment. If, for example, a jury were hung, then it could be excused, and a new jury empaneled to watch the audiovisual recording and arrive at a verdict. This would be a significant change in Ohio law to result from an administrative decision to record trials with audiovisual recording equipment, rather than through stenography.

**{¶ 40}** We conclude that a successor judge in a bench trial, absent the consent of the parties, may not render a verdict in a bench trial based solely upon a review of an audiovisual recording of the trial.

**B.   But a Contrary Result Is Required by the Doctrine of Collateral Estoppel.**

**{¶ 41}** Although we disagree with the decision of the federal district court in Slagle's habeas corpus proceeding, the doctrine of collateral estoppel precludes relitigation of that issue. That doctrine was explained by the Supreme Court of Ohio in *Whitehead v. General Tel. Co.*, 20 Ohio St.2d 108, 112, 254 N.E.2d 10 (1969), as follows:

> The second aspect of the doctrine of res judicata is 'collateral estoppel.' While the merger and bar aspects of res judicata have the effect of precluding a plaintiff from relitigating the same cause of action against the same defendant, the collateral estoppel aspect precludes the relitigation, in a second action, of an issue that has been actually and necessarily litigated and determined in a prior action which was

based on a different cause of action. Restatement of the Law, Judgments, Section 45, comment (c) and Section 68(2); *Cromwell v. County of Sac* (1876), 94 U.S. 351, 24 L.Ed. 195. In short, under the rule of collateral estoppel, even where the cause of action is different in a subsequent suit, a judgment in a prior suit may nevertheless affect the outcome of the second suit.

{¶ 42} The federal district court unquestionably had jurisdiction; Slagle actually invoked that jurisdiction. Although the parties adverse to Slagle in the two actions are nominally different – the Montgomery County Common Pleas Court in the federal action, the State of Ohio in the case before us – we agree with the State that the State of Ohio is the real party in interest in both cases. The requirement of mutuality of parties, which Slagle argues is not satisfied here, is satisfied where all of the parties to the present proceeding were bound by the prior judgment. *North Olmstead v. Eliza Jennings, Inc.*, 91 Ohio App.3d 173, 184, 631 N.E.2d 1130 (8th Dist. 1993). The State was surely bound by the federal court order in Slagle's habeas corpus proceeding; had the common pleas court failed to render a verdict in the manner prescribed by, or within the time limit prescribed by, the federal order, the State could not have continued to incarcerate Slagle in defiance of the federal court's order.

{¶ 43} In adopting the reasoning set forth in *State v. Lemmer* (Minn. 2007), 736 N.W.2d 650, the Supreme Court of Ohio has held that: " * * * the dispositive issue is whether the party sought to be bound by the previous determination 'had a controlling participation in the first action.' " *State ex rel. Estate of Miles v. Village of Piketon*, 121 Ohio St.3d 231, 2009-Ohio-786, 903 N.E.2d 311, at ¶ 29, quoting from *Lemmer*. Slagle clearly had a "controlling participation" in the federal habeas corpus action. He was the petitioner, and he obtained relief, if not the precise

relief he was requesting.

**{¶ 44}** In the federal habeas corpus proceeding, Slagle took the position that there was no manifest necessity for a mistrial upon the death of Judge Davis, because the trial court had the alternative of submitting the case to a successor judge, to render a verdict after reviewing the audiovisual record of the trial. Presumably, Slagle also took the position he had taken when he moved for dismissal of the indictment on double-jeopardy grounds – that a mistrial having been declared, albeit improperly, it was now too late to afford him any remedy short of dismissal of the indictment.

**{¶ 45}** The federal court agreed with Slagle in part; and disagreed with him in part. It agreed with Slagle that a mistrial ought not to have been declared; but it disagreed with him that it was now too late to provide a remedy less than outright dismissal of the indictment. It issued a conditional writ of habeas corpus ordering that: "Slagle shall be discharged from further responding to the Indictment unless the Common Pleas Court renders a decision on the video record already created not later than 180 days from the date judgment is entered in this matter." *Slagle v. Court of Common Pleas of Montgomery County, Ohio*, 2009 WL 2982880 at *1. Having invoked the jurisdiction of the federal court to obtain that result, Slagle is now bound by it.

**{¶ 46}** Slagle argues that the federal court's holding that the state trial court could proceed by having a successor judge render a verdict on the audiovisual record of the completed bench trial was not necessary to its judgment, so that the doctrine of collateral estoppel does not apply. This argument is difficult for us to understand. The judgment of the federal district court was that the state trial court must either proceed in the specified manner, or Slagle must be discharged under

double-jeopardy grounds. Essential to the federal court's holding that double jeopardy would apply was its conclusion that the mistrial declared by the state trial court was not necessary, because the alternative procedure was available.

{¶ 47} Thus, even though we disagree that a successor judge in a bench trial may properly, under Ohio law, render a verdict based solely upon review of the audiovisual record of the trial, for the reasons set forth in Part III-A, above, the federal court so held, and the doctrine of collateral estoppel precludes relitigation of that issue. Likewise, the doctrine of collateral estoppel precludes relitigation of the holding of the federal court, which is at least implicit in its order, that for the trial court to follow the procedure set forth in the federal court's order does not violate the Double Jeopardy clause.

{¶ 48} Slagle's First Assignment of Error is overruled.

### IV. Slagle Did Not Own the Fees He Stole, for Purposes of the Theft Statute – R.C. 2913.02(A).

{¶ 49} Slagle's Second Assignment of Error is as follows:

THE COURT ERRORED IN DENYING DEFENDANT'S CRIMINAL RULE 29(A) MOTION BECAUSE THE STATE PRESENTED INSUFFICIENT EVIDENCE TO SUSTAIN A FINDING OF GUILT FOR THEFT UNDER R.C. 2913.02(A)(2) AND R.C. 2913.02(A)(3).

{¶ 50} Slagle was charged with Theft under both R.C. 2913.02(A)(2) and 2913.02(A)(3), which provide as follows:

(A) No person, with purpose to deprive the owner of property or services, shall knowingly obtain or exert control over either the property or services in any of

the following ways:

(1) * * * ;

(2) Beyond the scope of the express or implied consent of the owner or person authorized to give consent;

(3) By deception;

* * *

{¶ 51} Slagle predicated his motion for judgment of acquittal – and he predicates this assignment of error – upon the proposition that one cannot be convicted of Theft of property in which one has an ownership interest. He cites *State v. Rhodes*, 2 Ohio St.3d 74, 76, 442 N.E.2d 1299 (1982), for the proposition that: "The important question is not whether the person from whom the property was stolen was the actual owner, but rather whether the defendant had any lawful right to possession."

{¶ 52} Slagle claims that he had an ownership interest in the fees that he stole from Pickrel, Schaeffer, Ebeling, Co. But as the State points out, his contract of employment with PS&E unequivocally states that all clients are clients of the law firm, not of individual attorneys, and that all fees received from the practice of law belonged to, and were to be turned over to, the firm.

{¶ 53} Slagle asserts that he had an interest in the fees by virtue of quantum meruit. But quantum meruit is a doctrine providing for reasonable compensation for services where there is no contract. The doctrine has been held to apply in the case of an attorney who is discharged by a client, even if there had been a contract retaining the services of the attorney, but that is because the contract is no longer enforceable, the client having exercised his or her right to dispense with

the services of the attorney. *See, Fox & Associates Co. L.P.A. v. Purdon*, 44 Ohio St.3d 69, 541 N.Ed.2d 448 (1989). In the case before us, there was a contract between Slagle and PS&E, still in force, providing that the fees belonged to PS&E.

{¶ 54} Slagle contends that some of the fees he was alleged to have stolen were earned for work performed after he left PS&E, but he provides no support in the record for this contention. Finally, he contends that he had an ownership interest in the fees generated from his work by virtue of his status as a shareholder in the corporation. He provides no authority for this proposition. He may have owned shares of stock in General Motors, as well, but that would not make his theft of a General Motors automobile from a local dealer any less than Theft under the Ohio Revised Code.

{¶ 55} Slagle's Second Assignment of Error is overruled.

**V. Slagle's Four-Year Sentence Was Appropriate, and Not Disproportionate.**

{¶ 56} Slagle's Third Assignment of Error is as follows:

SLAGLE'S FOUR YEAR SENTENCE FOR THEFT UNDER R.C. 2913.02(A)(2) AND R.C. 2913.02(A)(3) WAS INAPPROPRIATE, AND NOT PROPORTIONATE TO THE CRIMES.

{¶ 57} Slagle stole at least $500,000 from the law firm in which he was a shareholder, trusted by his colleagues. This was the maximum amount corresponding to the degree of his offense, a third-degree felony, under the statute in existence at the time of his offense.

{¶ 58} Before Slagle was sentenced, he had been convicted in Highland County in two

cases for stealing money from clients out of settlements they had won.

{¶ 59} Slagle showed no remorse. In the pre-sentence investigation report, under "Offender's Statement," it is noted that Slagle still did not appreciate the criminal nature of his conduct, in the course of which he plotted and schemed to steal legal fees that did not belong to him:

> During the presentence investigation interview, Mr. Slagle stated that this case is really a civil case in that it is a breach of contract. Beyond that, he does not really know what happened, except he went from employment to having to deal with Mat Heck [the Montgomery County Prosecutor]. He indicated that this case has been going on for many years and part of it is still in Federal Court. Mr. Slagle stated that the whole situation is very complicated. Mr. Slagle stated that the case is about a dispute between him and the law firm that employed him.

{¶ 60} The trial court had the option of sentencing Slagle to one, two, three, four, or five years in prison. It chose a sentence of four years. To argue that this sentence is disproportionate to the magnitude of Slagle's offense, or is otherwise inappropriate, borders on the ludicrous.

{¶ 61} Slagle's Third Assignment of Error is overruled.


### VI.   The Award of Restitution in Excess of $500,000 Was Error.

{¶ 62} Slagle's Fourth Assignment of Error is as follows:

THE COURT'S ORDER OF RESTITUTION FOR $521,000 WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND PLAIN ERROR.

{¶ 63} When Slagle stole the money, Aggravated Theft was defined by R.C. 2913.02(B)(2) as the theft of property having a value of $100,000 or more, but less than $500,000. The trial court found that he had stolen $780,000, but had returned $159,333.33, leaving a balance of $521,000. The court ordered restitution in that amount.

{¶ 64} Slagle contends that there is nothing in the record to support the amount of restitution awarded. The pre-sentence investigation report recites that PS&E reported that the fees stolen totaled "approximately $780,000," that Slagle had returned $159,333.33 to the firm, and that PS&E had received $100,000 from its insurer, Cincinnati Insurance Company, which had initiated subrogation litigation (presumably against Slagle). $780,000 less the $100,000 subrogation payment, and less the $159,333.33 Slagle returned to PS&E, leaves a balance of $520,666.67, which the trial court appears to have rounded off as $521,000. The pre-sentence investigation report supports a restitution figure of $520,666.67.

{¶ 65} We have held, however, that in the absence of an agreement by a defendant to a larger award, restitution may not be awarded in an amount in excess of the amount of loss charged in the indictment. *State v. Ratliff*, 194 Ohio App.3d 202, 2011-Ohio-2313, 955 N.E.2d 425 (2d Dist.), at ¶ 2, 17. In this case, Slagle did not agree to pay restitution in excess of $500,000, the maximum amount of the element of theft of which he was convicted. Therefore, the award of restitution in excess of that amount is error.

{¶ 66} Slagle also contends that the trial court failed to consider his present and future ability to pay restitution before awarding it. He did not object to the award, and he has not demonstrated in the record that the trial court failed to consider his ability to pay restitution.

**{¶ 67}** As the State notes, Slagle has been a successful litigation attorney in the private sector for over twenty-five years. Therefore, even assuming that his ability to earn income has been substantially reduced as a result of his conviction and incarceration, it is reasonable to assume that he has significant assets. He did not present evidence that the fees he stole from PS&E have all been dissipated.

**{¶ 68}** Because Slagle did not dispute the amount of restitution awarded, request a hearing, or otherwise object, he has waived all but plain error. *State v. Cochran*, 2d Dist. Champaign No. 09CA0024, 2010-Ohio-3444, at ¶ 19. To the extent that the award of restitution in this case exceeds the maximum amount – $500,000 – of the element of the theft of which Slagle was convicted, we find plain error to be demonstrated in the record. Otherwise, we find no plain error.

**{¶ 69}** Slagle's Fourth Assignment of Error is sustained in part.

## VII.  Conclusion.

**{¶ 70}** Slagle's Fourth Assignment of Error having been sustained in part, and all his other assignments of error having been overruled, that part of the judgment ordering restitution in the amount of $521,000 is Reversed, the judgment is Affirmed in all other respects, and this cause is Remanded to the trial court for the limited purpose of reducing the amount of restitution ordered to $500,000.

. . . . . . . . . . . . .

GRADY, P.J., and FROELICH, J., concur.

Copies mailed to:

Mathias H. Heck
Kirsten A. Brandt
R. Jason Howard
Hon. Frances E. McGee